# Hospitality Inns, Inc. and Lodging North, Inc. v. South Burlington R.I., Inc., Andrew Corologos, Thomas Dowe, Donald Dumont, Gloria Jones, Onalee Jones, William Jones, John Trono, Ralph R. Deslauriers, and Bolton Valley Corp.

[571 A.2d 40]

No. 87-524

Present: Peck and Morse, JJ., and Barney, C.J. (Ret.), Springer, D.J. (Ret.) and Martin, Supr. J., Specially Assigned

Opinion Filed October 6, 1989
Motion for Reargument Denied January 4, 1990

*Robert S. DiPalma* of *Paul, Frank & Collins, Inc.*, Burlington, for Plaintiffs-Appellees.

*Thomas F. Heilmann* and *Janice A. Forgays* of *Thomas F. Heilmann, P.C.*, Burlington, for Defendant-Appellant South Burlington R.I.

*Fred I. Parker* and *Alison J. Bell* of *Langrock Sperry Parker & Wool*, Burlington, for Defendants-Appellants Deslauriers and Bolton Valley Corp.

**Peck, J.** Plaintiff obtained a superior court order specifically enforcing an agreement for the sale of a motel in South Burlington against the owner and another prospective purchaser. Defendants appeal because plaintiff failed to obtain the two-thirds shareholder approval as required by 11 V.S.A. § 2002 and plaintiff's sales agreement. We reverse and remand.

Defendant South Burlington R.I., Inc. (SBRI) is a corporation which owned and operated the Ramada Inn on Williston Road in South Burlington. Plaintiff Hospitality Inns, Inc. (Hospitality) wished to acquire the Ramada Inn.[1]

During June of 1987, Hospitality prepared three different sales agreements. First, on June 14, Hospitality delivered a document entitled "Deposit Receipt and Sales Agreement" to SBRI's attorney offering to purchase all of the assets of SBRI. It contained the following language:

Sale is contingent upon:

. . . .

3. Buyer and Seller entering into a formal Purchase & Sale Agreement acceptable to both Buyer and Seller.

---

[1] A separate corporation was formed for the purpose of the Ramada Inn acquisition, Lodging North, Inc., but the plaintiff will be referred to as Hospitality.

> If any of above conditions are not met, deposit shall be returned to Buyer.

Second, on June 17, 1987, SBRI's attorney and Hospitality's broker modified the "Deposit Receipt and Sales Agreement" to include the following language:

> This Contract is contingent upon approval by a ⅔ majority of Seller's shareholders; Seller shall hold a special shareholder's meeting for this purpose on or before 7/15/87.

SBRI's attorney executed the amended document as "Authorized Agent" for SBRI, and Hospitality's president signed it for the purchaser. The third document was never executed by either seller or purchaser. However, according to the trial court this agreement reflected "serious and substantial negotiations culminating in a final draft," and it was introduced into evidence. It covered many subjects not dealt with in the Deposit Receipt and Sales Agreement, such as covenants not to compete and a paragraph dealing with buyer's right of specific performance.

On June 26, 1987, defendants Ralph R. Deslauriers and the Bolton Valley Corporation (collectively, BVC) submitted a written offer to SBRI's attorney to purchase the assets of the Ramada Inn for an amount greater than Hospitality's offer.

At a meeting of SBRI's board of directors on July 1, 1987, SBRI's attorney reported that he had signed the Deposit Receipt and Sales Agreement with Hospitality on June 17, 1987. The directors then notified the SBRI shareholders of a meeting set for July 15, 1987, to consider the sale.

Between the directors' meeting and July 15, 1987, BVC increased its offer for purchase of the Ramada Inn.

At the July 15, 1987, meeting the SBRI shareholders approved the sale to Hospitality. However, the shareholders suspended the action because the vote did not include shareholders who left prior to the vote. SBRI's attorney advised the shareholders that "the [Deposit Receipt and Sales Agreement] is binding on the corporation until terminated properly, and that the corporation, until then, cannot entertain another offer." Minutes of the meeting reflected division among the shareholders about approving the Hospitality offer.

Upon learning that the Deposit Receipt and Sales Agreement had not been ratified, Hospitality extended the SBRI shareholder approval deadline to July 27, 1987. At the July 27th meeting the SBRI shareholders rejected the sale to Hospitality[2] and approved BVC's offer.

Hospitality then brought suit claiming breach of contract by SBRI and alleging tortious interference with a contractual relationship by BVC, seeking specific performance and damages from SBRI and damages from BVC. The parties agreed to litigate the specific performance issue before any of the remaining issues. The court granted specific performance and plaintiff's motion under V.R.C.P. 54(b) for entry of final judgment with respect to that issue. SBRI complied with the court's order of specific performance on October 23, 1987. SBRI and BVC appealed. We denied plaintiff's motion to dismiss the appeal for want of a final judgment on May 6, 1988, and defendants' appeal is now before us.

The trial court granted specific performance because the Deposit Receipt and Sales Agreement created an enforceable obligation, giving Hospitality the option of performing either under that document or the longer, unexecuted draft agreement. Central to the court's decision was the testimony of SBRI's attorney, Thomas Little, who drafted the handwritten addition to the Deposit Receipt and Sales Agreement. The court concluded:

I. Little's answer persuades the court that the parties' intention, in paragraph 9, was not to set up their own hurdle to contractual effectuation, but merely to comply with the requirements of law. Hence paragraph 9 constitutes no more of a contingency than whatever applicable corporate law may provide.

The court discussed 11 V.S.A. § 2002[3] and concluded:

---

[2] The trial court found that the shareholders "never explicitly rescinded the July 15 vote approving the sale to Hospitality." Since that vote had been suspended at the July 15 meeting, shortly after it was passed, the significance of the trial court's finding is unclear. Even without the July 15th vote to suspend, the defeat of the resolution to approve the Hospitality offer on July 27 was a clear rescission of the earlier approval resolution.

[3] 11 V.S.A. § 2002 states in relevant part:

A sale . . . of all, or substantially all, the property and assets, with or without

[Section 2002's] purpose is not to reallocate the responsibility and authority for management, under some circumstances, from the directors to the shareholders. Nor is its purpose to permit corporations to enter into one-sided deals, in which the purchasers are bound while the corporation may still scout around for sweeter offers.

■ SBRI and BVC argue correctly that no contract for sale of the Ramada Inn was ever entered. The "deal" was not, and could not have been considered, "one-sided." Hospitality, a well-counseled business entity, was aware that until shareholder approval was obtained, no document served as any more than an agreement subject to a condition, or as an offer by a prospective purchaser subject to acceptance. Hospitality was charged with the knowledge that the effectiveness of the document in question was contingent on acceptance by two-thirds of the shareholders.

■ Given both the text of the agreement and the mandate of 11 V.S.A. § 2002 requiring shareholder approval of particular sale offers,[4] Hospitality's offer required the consent of two-thirds of SBRI's shareholders. All acts by the designated purchaser must be performed before a contract can spring into being from the initial offer. Restatement (Second) of Contracts §§ 50, 52, 56 (1981); *Bachli v. Holt*, 124 Vt. 159, 163, 200 A.2d 263, 266 (1964). Here, both parties were aware of the contingencies that stood between the Deposit Receipt and Sales Agreement and a binding agreement. While many of the terms and conditions in the lengthy,

---

the goodwill, of a corporation, if not made in the usual and regular course of its business, may be made upon such terms and conditions and for such consideration, . . . as may be authorized in the following manner:

(1) The board of directors shall adopt a resolution recommending such sale, . . . and directing the submission thereof to a vote at a meeting of shareholders, which may be either an annual or a special meeting.

(2) Written or printed notice shall be given to each shareholder of record entitled to vote at such meeting . . . .

(3) . . . Such authorization shall require the affirmative vote of the holders of at least two-thirds of the outstanding shares of the corporation . . . .

[4] Section 2002 requires shareholder approval of a sale based on specific terms. It does not contemplate a vague and general authorization to sell on any terms. Cf. *Downing Development Corp. v. Brazelton*, 253 Md. 390, 396–98, 252 A.2d 849, 853 (1969) (corporate resolution purportedly authorizing sale gave no indication that an offer to purchase had been submitted to the directors).

unexecuted agreement were "boilerplate," other provisions, such as the noncompetition agreement, were material, not reasonably implied in the sale itself, and subject to negotiation.

██ Even if the parties' intent to negotiate further before entering a binding contract was ambiguous, the requirement of consent by two-thirds of SBRI shareholders is clear. "'[C]onstruction of contract terms is a matter of law and not a factual determination. . . . This Court, therefore, must review for itself the proper legal effect of contract language.'" *Dartmouth Savings Bank v. F.O.S. Associates*, 145 Vt. 62, 68, 486 A.2d 623, 626 (1984) (quoting *Vermont National Bank v. Chittenden Trust Co.*, 143 Vt. 257, 266–67, 465 A.2d 284, 290 (1983)). We disagree with the trial court's conclusion that the Deposit Receipt and Sales Agreement was ambiguous. "'The law will presume that the parties meant, and intended to be bound by, the plain and express language of their undertakings.'" *Trustees of Net Realty Holding Trust v. AVCO Financial Services of Barre, Inc.*, 144 Vt. 243, 246–47, 476 A.2d 530, 532 (1984) (quoting *Vermont State Colleges Faculty Federation v. Vermont State Colleges*, 141 Vt. 138, 144, 446 A.2d 347, 350 (1982)).

██ Far from barring shareholders from promoting self-interest, the two-thirds approval requirement clearly allows a minority of shareholders to weigh their own interests without constraints and to vote accordingly. The model legislation for § 2002 is based on the very possibility that the management of a corporation might affect adversely minority shareholders. See 2 Model Business Corporation Act Annotated 2d §§ 78, 79, at 415–16 (West 1971). A sale of all of the corporate assets is only valid when the statutory assent is given. *Dutch Hill Inn, Inc. v. Patten*, 129 Vt. 466, 471, 282 A.2d 815, 818 (1971) (construing a predecessor to § 2002, 11 V.S.A. §§ 161, 162(a)); see *Neff v. World Publishing Co.*, 349 F.2d 235, 252–53 (8th Cir. 1965); *Downing Development Corp. v. Brazelton*, 253 Md. at 397, 252 A.2d at 855; *Finklea v. Caroline Farms Co.*, 196 S.C. 466, 472, 13 S.E.2d 596, 599 (1941); *Smith v. Good Music Station Inc.*, 36 Del. Ch. 262, 266-68, 129 A.2d 242, 245 (1945); *Jeppi v. Brockman Holding Co.*, 34 Cal. 2d 11, 16, 206 P.2d 847, 849 (1949).

■ The trial court also determined that because the shareholders had approved a liquidation plan under § 337 of the Internal Revenue Code the "usual and regular course" of SBRI's business had changed to its own liquidation, and sale of the assets was no longer subject to § 2002 because it was at that point "made in the usual and regular course of its business." We disagree. Construing liquidation as part of the "ordinary" course of business defeats the purpose of § 2002. Shareholder approval for liquidation does not divest minority shareholders of § 2002's protection.

Plaintiff contends that "[o]nce SBRI's shareholders adopted liquidation as the corporate objective, sale of assets was no longer an 'unusual transaction.'" *Gimbel v. Signal Co.*, 316 A.2d 599 (Del. Ch. 1974). *Gimbel* does not support plaintiff's position. There the shareholders maintained that their consent was required to sell off a subsidiary. The court concluded that the proposed sale did not constitute "all or substantially all" of Signal's assets and characterized Signal as a conglomerate for which "acquisitions and dispositions have become part of the ordinary course of business." 316 A.2d at 608. The difference between *Gimbel* and this case is great. Hospitality is not a conglomerate continually involved in mergers and acquisitions.

Even if the statute would not have applied because sale of all of its assets was SBRI's ordinary business, plaintiff does not explain why the shareholder approval clause in the agreement should be voided. Terms may be included in agreements that go beyond narrow statutory requirements.

■ The agreement was not approved, either directly by two-thirds of the shareholders or through approval by the board of directors, because of their percentage of stock ownership. SBRI's stock is not so closely held that it was inequitable for the shareholders to assert an identity separate from that of the board of directors. Consequently, the decision below granting specific performance must be reversed.

*The order of the trial court directing specific performance is reversed and the matter remanded for entry of an order directing reconveyance to South Burlington R.I., Inc. of the property conveyed to Hospitality Inns, Inc. and Lodging North, Inc. on Octo-*

*ber 23, 1987, and for consideration of any remaining issues in light of this opinion.*