## Donald Gannon, et al. and Quechee Lakes Landowners' Association, Inc. v. Quechee Lakes Corporation, et al.

[648 A.2d 1378]

No. 93-087

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed August 26, 1994

466

*W.E. Whittington IV* of *Brooks McNally Whittington Platto & Vitt,* Norwich, for Plaintiff-Appellant Quechee Lakes Landowners' Association, Inc.

*James B. Anderson* of *Ryan Smith & Carbine, Ltd.,* Rutland, for Defendants-Appellees.

**Allen, C.J.** Defendant Quechee Lakes Corporation (QLC) is the developer of Quechee Lakes Development, a planned second-home community in Quechee. Plaintiff Quechee Lakes Landowners' Association, Inc. (QLLA), is a nonprofit corporation representing the interests of individual unit owners in the community. QLLA appeals from a superior court decision construing a 1981 order that followed settlement of a class action suit by unit owners against QLC.

QLC drafted the Quechee Lakes Master Plan for development of the land; prepared and recorded covenants, declarations and bylaws to govern the development; and created QLLA in accordance with those governing documents. Thereafter, QLC developed and sold units within the development to third-party purchasers. QLLA holds title to and administers the common lands, including golf courses, ski areas, lakes, common buildings and other areas sometimes referred to by the parties as "greenbelt." QLLA also administers other facilities shared by members of the community, sets and collects dues and assessments, and represents members' interests generally. All "bona fide third party purchasers" of units are required to be QLLA members and pay dues and assessments to the association. Memberships are based on unit ownership. QLC is required to make contributions to QLLA's capital improvement fund on the sale of units to bona fide third parties.

This action originated in a class action brought in 1978 by certain individual unit owners against QLC and its affiliated companies. QLLA was not a member of the original class because QLC controlled QLLA from its inception in 1970 until after the action was filed, when QLC lost its majority share in QLLA through sale of units. The class representatives and QLC held negotiations in late 1979 and early 1980, and reached an agreement resolving many of their disputes. The parties executed the agreement and submitted it to the court for approval, pursuant to V.R.C.P. 23(e), in November 1980.

In February 1981, after QLC lost its controlling interest, QLLA moved for admission to the plaintiff class so it could file objections to the proposed settlement. In March 1981, QLC moved for "clarification" of the agreement as to stated issues. The court granted QLLA's motion for admission to the plaintiff class, but found the settlement to be fair and approved it over QLLA's objections. On August 5, 1981, the court entered an order incorporating the terms of the settlement

agreement. The court also denied QLC's motion to "clarify" the agreement. Neither QLC nor QLLA appealed.

Though numerous questions arose after entry of the 1981 order, no litigation ensued in the years immediately thereafter. The parties entered an "Open Space Agreement" in 1987 in an attempt to define and describe "common land" within the meaning of the 1981 settlement. By 1988, however, at least three major issues had arisen, and both parties moved for relief under the 1981 order. QLLA requested that QLC be compelled to pay dues and assessments to QLLA with respect to units it has reacquired from individual owners, and that QLC be ordered to convey to QLLA the common lands it holds, free of any encumbrance. QLC sought an amendment to the provision in the 1981 order relating to its obligation to pay capital contributions to QLLA upon sale of units.

After hearing, the court ruled that QLC was not required to pay dues or assessments on lots or units previously conveyed to "ultimate user" third parties but thereafter reacquired by QLC. The court also held that QLC was obligated to convey the "common lands" to QLLA, but was not obligated to secure mortgage releases with respect to those lands. In addition, the court concluded that there was no complete and definitive description of common lands under the 1981 order, and directed QLLA to draft and submit deeds to be executed by QLC in furtherance of its conveyance covenant. Finally, regarding capital contributions, the court concluded that QLC was not obligated under the 1981 order to pay into QLLA's capital improvement fund for what the court termed "bulk land sales." QLLA unsuccessfully moved for reconsideration of the court's order, and now appeals. We affirm the trial court's ruling regarding dues for reacquired units and capital contributions, but remand for further proceedings on QLLA's rights to capital contributions from bulk transferees. We reverse the trial court's ruling regarding conveyance of common lands and remand for further proceedings.

## I.

Before addressing the substantive issues on appeal, we first consider the appropriate standard of review. The trial court's findings of fact will not be disturbed unless they are clearly erroneous, V.R.C.P. 52(a)(2). The 1981 judgment order essentially ratified an agreement between the parties to the class action, a clear quid pro quo in which QLLA and QLC each advanced vital interests in exchange for surrender of certain claims and recognition of rights and

interests of the other party. On appeal, the parties agree that the order should be construed as a contract. QLLA may have wanted a different bargain after it entered the action, but as a party it took the bargain incorporated into the order without appeal, and its prior objections and misgivings did nothing to deprive the consent decree of its essential contractual nature. Construction of a contract is a matter of law, not a factual determination. *Ianelli v. Standish*, 156 Vt. 386, 389, 592 A.2d 901, 903 (1991). Thus, this Court must make its own inquiry into the proper legal effect of the terms of the agreement, *Hospitality Inns, Inc. v. South Burlington R.I., Inc.*, 153 Vt. 410, 415, 571 A.2d 40, 43 (1989), employing the trial court's valid findings of fact.

QLLA argues for a strict construction of the order, contending that the intended meaning of the order is plain from the language of the document itself, and alternatively argues that any ambiguities must be resolved within the four corners of the judgment itself. Therefore, QLLA argues, the trial court erred in considering extrinsic evidence of the parties' actions and intentions to discern the proper meaning of the order. We agree with the trial court that the intended meaning of the contested provisions is not self-evident from the text of the order and that extrinsic evidence was permissible. See *Stratton v. Cartmell*, 114 Vt. 191, 194, 42 A.2d 419, 421 (1945) (when the language used will admit more than one interpretation, parol evidence is admissible). We reach this conclusion, however, for different reasons which are outlined in the discussion below. Moreover, QLLA fails to demonstrate how our review of the court's decision would differ in any significant way if we agreed that the terms of the 1981 order were strictly court-imposed and not based on an underlying settlement between the parties.

## II.

QLLA first disagrees with the trial court's construction of the provision dealing with unit dues and assessments payable by QLC to QLLA. In relevant part, paragraph 9 of the 1981 order states:

Except as otherwise provided herein, [QLC] shall not be obligated to pay any dues, assessments, fees or special charges, *including delinquent dues which may be owing on repossessed lots*, on any membership attributable to a lot which is owned, both legally and equitably, by [QLC].

(Emphasis added.) The court concluded that QLC's exemption for repossessed units also covers units that QLC had conveyed to ultimate-user third parties and subsequently reacquired. The term "repossessed" is defined nowhere in the order, but we conclude that, in light of the general purpose and context of the agreement incorporated in the 1981 order, "repossession" should not be limited to a retaking by a creditor in the wake of a debtor's default. *Stratton*, 114 Vt. at 194, 42 A.2d at 421 (in construing contract terms, the court may look to the intended purpose and circumstances). In exchange for an exemption from dues and assessments for properties held in inventory, QLC relinquished the votes associated with the memberships it held in inventory, effectively yielding control of QLLA to the end purchasers.

The parties' conduct after 1981 confirms the strong implication of the language of the settlement.[1] See *Murphy v. Britton*, 109 Vt. 522, 525, 1 A.2d 724, 725 (1938) ("[I]n determining the meaning of an indefinite or ambiguous contract, the construction placed upon it by the parties may be considered by the court."). After entry of the order, QLLA amended its bylaws to exempt units held by QLC from dues, and did not bill QLC for dues between the settlement and consent decree and 1988. Between 1984 and 1986, QLC and QLLA entered into six agreements designed to prevent the Town of Hartford from foreclosing on liens for delinquent taxes. Under each of these agreements, QLC paid the delinquent taxes, QLLA foreclosed its lien for delinquent membership dues, and then QLLA sold the foreclosed unit to QLC for the amount of the foreclosed dues. The trial court found that under this arrangement, QLC paid QLLA over $200,000. The court added:

> There is no evidence that any party expected the lots so reacquired would hold a status different than others in developer's inventory. At a time when developer was not selling all that

---

[1] QLLA maintains that the subsequent conduct of the parties is irrelevant. But again, its argument rests on the faulty premise that QLLA never "consented" to the agreement or the settlement decree, and hence there was never any agreement which later conduct might be used to interpret. Not only was QLLA bound by the 1981 order as a consent decree, having not pursued its objections by appeal of the order, but even if the order were not grounded in the consent of the parties, QLLA's post-order conduct—its actions and inactions—would be relevant to an understanding of what the order meant to each of the parties. The court could justifiably rely on a longstanding, common understanding of the meaning of the order.

many of its own lots, why would it acquire new ones on which it was to be obligated for association dues?

The soundness of this conclusion is supported by the conduct of the parties after each of these transactions, specifically the absence of any demand for dues by QLLA. It may be inferred that if, after the first such transaction in 1984, QLLA had demanded membership dues with respect to the foreclosed lot, QLC would have raised the issue in the subsequent foreclosure agreements.

■   QLLA also argues that QLC incurred a dues obligation on reacquired properties because of language in paragraph 12 of the order, which provides that "all memberships [that QLC] transfers or assigns shall then be dues-paying memberships." The effect of this provision, QLLA contends, is that once a property is sold, the transferred membership (heretofore non-dues-paying under the order) becomes dues-paying, "then" meaning "forever after." We disagree that paragraph 12 unambiguously demands that QLC be treated as any other individual buyer after the first conveyance of the lot from QLC to a purchaser activates the dues obligation. That construction flies in the face of the general principle—the very heart of the settlement—that QLC "shall not be obligated to pay any dues, assessments, fees or special charges . . . on any membership attributable to a lot which is owned, both legally and equitably, by [QLC]." Considering the order as a whole, its general intention to reduce QLC's financial obligations regarding memberships held in exchange for a relinquishment of voting power in QLLA, and the conduct of the parties, we conclude that QLC does not have to comply with dues and assessments obligations associated with its ownership of reacquired memberships in the development.

### III.

QLLA next contends that the court erred in construing the order so that QLC is not obliged to pay a "capital contribution" fee upon transfer of lots as part of a "bulk sale." The court relied on the following definition of sale in paragraph 17:

> A "sale by [QLC]" shall be deemed to have occurred on a *regular sale* when a closing takes place and shall be deemed to have occurred on an *installment sale* contract when the Buyer has made his initial deposit in full and the Agreement has been approved by the financing bank.

(Emphasis added.) At issue are two transactions: (1) a sale of properties worth between twelve and twenty million dollars to Quechee Development and Land Corporation, a company wholly owned by the owner of the controlling interest in QLC; and (2) a second, smaller sale to an unrelated entity also in the business of selling lots at retail. The trial court concluded that these were not "regular" sales and therefore they did not trigger the payment of capital contributions for each lot in the group conveyed. QLLA contends that the provision in paragraph 17 unambiguously makes no exception for the sale of large numbers of lots to other than end users, and therefore the court had no viable basis to exempt bulk transfers from the capital contribution requirement.

We agree with the trial court that bulk sales do not themselves obligate QLC to make capital contributions, but for different reasons. See *Harlow v. Miller*, 147 Vt. 480, 483, 520 A.2d 995, 998 (1986) (Court may affirm right result reached for wrong reasons). First, paragraph 9 clearly distinguishes between QLLA memberships held directly or indirectly by QLC and memberships assigned to third-party purchasers, which become subject to the obligations to pay dues, assessments and special charges. This distinction is carried through in the provisions of paragraph 17 relating to capital contributions, which provide for increasing levels of capital contribution by QLC as "memberships" increase in total number—memberships assigned to third-party purchasers as end users of the units. If a "sale" for capital contribution purposes meant *all* sales, including bulk sales, then all buyers, including bulk purchasers, would become QLLA members for all purposes. This result would threaten or defeat the main premise of the settlement—wresting control of QLLA from QLC and its "successors in interest, individually and collectively, and all persons or entities acting in concert or in participation with them."

Based on the court's findings, the two bulk sales raised none of the issues of control of QLLA sought to be addressed in paragraph 9 and met none of the criteria for capital contributions addressed in paragraph 17. Though assets were "sold," the larger of the two bulk sales was an asset restructuring by the principal owner of QLC, done for reasons that do not appear on the record. The trial court acknowledged that the second bulk sale was more problematic, since it was to a business entity apparently unrelated to QLC, but the court's finding that it was not a "triggering event" and that "[w]ithout new members, the association does not have the compelling need for the contributions" is sustained by the record.

■ Sale of some or all of the assets of a company can be one of the methods of transferring part or full ownership in the underlying business. See *Bader v. Alpine Ski Shop, Inc.*, 505 A.2d 1162, 1168 (R.I. 1986). In the present case, however, it appears that the motive for the asset transfers was not to transfer control of QLC. Instead, it was rather a means for QLC to raise capital and lower its overall investment risk. The record does not suggest that the bulk purchasers occupied any lots as end users, but rather purchased the property to engage in essentially the same development sales business as that of QLC. While the 1981 order did not discuss bulk sales or asset transfers, the omission does not mean the transaction was proscribed or that the court was compelled to treat the transfer under a provision intended to govern sales to end users. Neither the language of the documents nor the sense of the underlying transactions supports QLLA's argument that bulk transfers were covered in the settlement agreement and consent decree. If the order did not specify standards for determining what constituted a bulk sale and the respective rights of the parties under the 1981 order following such sales, the court was free, within its discretion, to determine those questions under principles of equity and fairness. *Pike Industries, Inc. v. Middlebury Assocs.*, 140 Vt. 67, 73, 436 A.2d 725, 728 (1981) (on reargument); see also *Berkeley Dev. Co. v. Great Atlantic & Pacific Tea Co.*, 518 A.2d 790, 796–97 (N.J. Super. Ct. 1986) (drug store, assignee of lease to supermarket once located in shopping center, could not enforce noncompetition clause in original lease to bar shopping center from seeking new supermarket; court was free to determine "what the lease would have provided for had the parties anticipated the present situation"). In this pursuit the court was only partially successful.

The trial court declined to rule on the association's rights in various interests in real property, when those interests are now held by third parties not present in this lawsuit, particularly the obligation of bulk transferees to pay dues to QLLA. The court reasoned that it could not enter an order binding on persons not parties to the litigation. But if the theory underlying allowance of bulk transfers was that they did not affect QLLA's rights to capital contributions, the court could not simply decline to consider the issue of QLLA's post-transfer rights simply because the transferees were not before it.[2] *Stavros v.*

---

[2] The record does not indicate the extent of actual or potential legal harm to QLLA resulting from bulk transfers, and we make no assumptions in that regard. Though third-party purchasers from a bulk transferee would be charged with notice of

*Karkomi*, 349 N.E.2d 599, 608 (Ill. App. Ct. 1976) (lis pendens having been filed, assignee of rights of buyer in purchase and sale agreement was not necessary party in suit to declare rights between original buyer and seller).

QLC was before the court and subject to its direction to take whatever steps might be necessary to protect QLLA's rights under the 1981 order. The court accommodated QLC in a reasonable manner, given the uncertainty of the future in August 1981 and given the broad authority of paragraph 21 regarding retained jurisdiction to adjudicate disputes and modifications of the 1981 order.[3] But there was no authority under the 1981 order to allow, in effect, the transfer of the bulk assets without recourse to QLC in the event transferees did not honor underlying covenants. The ruling that QLC could transfer assets in bulk free of the capital contribution covenant should have taken into account QLLA's rights to capital contributions under the 1981 order, and we remand so that the trial court may modify its order accordingly.

## IV.

Finally, QLLA argues that the court erred in not finding QLC in contempt for failure to convey common lands free of encumbrances. As to common lands, paragraph 14 of the 1981 order states in relevant part:

> [QLC] . . . [is] enjoined permanently from encumbering in any manner to third parties any of the remaining unconveyed Common Land or Green Belts and [is] further enjoined permanently from cutting or selling any timber or timber rights on such unconveyed Common Land or Green Belts. [QLC] shall convey such unconveyed Common Land to [QLLA] within a

---

restrictions and conditions included in recorded deeds, we cannot assume that deed restrictions would address all potential problems. We do know from the court's decision that the question of QLLA's rights after bulk transfers by QLC was raised and that the court declined to address it. The court should have done so.

[3] In relevant part, paragraph 21 provides:

Jurisdiction is retained by [the superior court] over this action for the purpose of enabling any of the parties named in or affected by this JUDGMENT ORDER, at any time, to apply to this Court requesting by motion that this matter be reopened and be brought forward on the docket for such further orders and directions as may be necessary or appropriate, for the construction or carrying out of this JUDGMENT ORDER, for the modification or termination of any provisions herein, for the enforcement of compliance therewith and the punishment of violations thereof . . . .

reasonable period of time free and clear of all liens and encumbrances.

There is no disagreement that the terms regarding conveyance and encumbrances are unambiguous. The trial court found that QLC "deeded relatively little greenbelt to the association" and that QLC had encumbered common land by mortgaging certain properties and allowing judgment creditors to obtain liens on other property. But the court also found that the parties had yet to reach agreement as to all parcels to be included as common lands. The court directed QLLA to prepare deeds reflecting the extent of common land in accordance with both the 1981 order and the 1987 "Open Space Agreement" defining common lands. QLC was given thirty days to file an objection.[4]

Given the uncertainty of the record, this aspect of the appeal must be remanded to the trial court. Since QLLA had not submitted its proposed deeds at the date of the court's order, this issue cannot be resolved at this time. Only when the deeds are submitted and QLC's possible objections resolved will the court be able to state finally, on the basis of evidence before it, whether or not any part of the common land is in fact encumbered.

■ Regarding two parcels that apparently were clearly denominated as future common lands at the time of the 1981 order, the trial court found them subject to mortgages and judgment liens. The court concluded that the lands should be conveyed to QLLA, but saw no practical purpose in requiring QLC to secure mortgage releases and judicial relief from the judgment liens. These conclusions are based entirely on the court's speculations and surmises, not on the plain and unambiguous language of the 1981 order. The court makes no findings with respect to its numerous pronouncements concerning the likely effect of directing QLC to convey common land in accordance with the 1981 order, and offers no theory in support of its conclusion. Whether or not conveyance by QLC of common land free of encumbrances might "accomplish anything" is not a judicial question.

The court noted that, in any event, the mortgagees in question were not before it, which precluded enforcement of the common land provisions of the 1981 order. But as we conclude above with respect to bulk sales, the absence of third parties does not necessarily prevent

---

[4] The record does not indicate if any of these steps have been taken, and in any event they would not be part of the present record.

resolution of the common lands question. The 1981 order directs QLC to act and does not condition that action on the willingness of a lienor to cooperate or negotiate, other than to release the lien upon payment of the underlying obligation secured by the lien, as the law requires. In sum, the court erred in ruling that the existing common areas could be conveyed without respect to the encumbrance provisions of the 1981 order.

Therefore, we reverse the trial court's ruling regarding the common lands issue. Once the QLLA deeds describing common lands have been approved, the trial court must determine whether QLC has complied with paragraph 14 of the 1981 order regarding conveyance to QLLA without encumbrance and within a reasonable time. As for the common lands already identified and encumbered, the trial court shall order QLC to discharge or obtain release on the obligations and convey the lands to QLLA, under fair and reasonable terms.

*Affirmed in part and reversed in part, and remanded for further proceedings in accordance with this opinion.*