2009 VT 50

**A2, INC., C-F Trust, and Champlain Advisory Group, Inc. v. CHITTENDEN TRUST COMPANY**

[986 A.2d 252]

No. 08-122

¶ 1. May 12, 2009. This appeal concerns the propriety of defendant Chittenden Trust Company's (Chittenden) transfer of sewage treatment capacity allocated to it by the Town of Colchester to another developer and to the town for use outside the development. Plaintiffs A2, Inc., C-F Trust, and Champlain Advisory Group, Inc. appeal from the November 2007 decision of the superior court granting summary judgment in favor of defendant on this issue. We affirm.

¶ 2. Viewed in the light most favorable to plaintiffs, the record before the superior court on summary judgment revealed the following facts. In the late 1980s, Richard Eastman and James Kfoury purchased land in Colchester, Vermont and began the process of developing Water Tower Hill. As part of this process, Eastman and Kfoury sought and obtained a variety of necessary permits, including a Vermont Land Use Permit (Act 250

Permit) and a municipal permit. In approving Eastman and Kfoury's development proposal, both permitting authorities made findings of fact regarding the developers' arrangement with the town to provide them with sewage capacity sufficient to handle the project's estimated maximum sewage flow of 200,000 gallons per day. Eastman and Kfoury were required to pay $0.66 per gallon annually for the reserved sewage allocation.

¶ 3. By the early 1990s, Eastman and Kfoury had sold only a few lots at Water Tower Hill and began encountering financial difficulties. Ultimately, to settle their debts and to avoid litigation, Eastman and Kfoury transferred title to the unsold lots to Eastern Real Estate Corporation (EREC), an entity formed by Vermont Federal Bank, which had financed the development. EREC took title to the lots in 1991 and assumed responsibility for paying the various expenses associated with the lots, including the annual fee for the development's sewage allocation. Subsequently, Vermont National Bank acquired Vermont Federal Bank, including its subsidiary, EREC, and in 2000, defendant Chittenden acquired Vermont National Bank. For the sake of convenience, hereinafter we refer to Chittenden and its predecessors in interest as "Developer" unless specifically indicated otherwise.

¶ 4. In 1994, plaintiffs C-F Trust and Champlain Advisory Group purchased lots A-1.1 and A-14, respectively, and in 1996, plaintiff A2, Inc. purchased lot A-2.[1] A purchase and sales agreement accompanied the sale of each lot by limited warranty deed. Among other terms, the purchase and sales agreements pertaining to lots A-1.1 and A-14 contained provisions reserving sewage capacity for the lots. Plaintiff C-F Trust requested and

received an allocation of 1,200 gallons per day for lot A-1.1, whereas plaintiff Champlain Advisory Group requested and received an allocation of 1,500 gallons per day for lot A-14. The purchase and sales agreement pertaining to the sale of lot A-2 did not contain a sewage allocation.

¶ 5. When plaintiffs approached the Town of Colchester in 2002 to request the conditional use permits required to begin their development, they learned that the town no longer had sufficient sewer capacity to accommodate their plans. Unbeknownst to plaintiffs, in 1998, Developer had engaged in a transaction whereby its then-uncommitted sewage allocation was divided between the purchasers of a lot in Water Tower Hill and the Town of Colchester. In connection with the purchase of lot A-20, Developer transferred 1,000 gallons per day of its allocation to Gabriel and Diane Handy. Developer transferred an additional 10,000 gallons per day of its allocation to the Handys "for their use for any of their properties located at Exit 16, Colchester, Vermont." Finally, Developer returned the balance of its sewage allocation, approximately 52,000 gallons per day, to the Town of Colchester. The town subsequently transferred its remaining sewage capacity to other parties in early 2002 — prior to plaintiffs' permitting requests.

¶ 6. In 2004, plaintiffs sued both the Town of Colchester and Developer. After the commencement of the lawsuit, plaintiffs reached an agreement with the town that had the effect of transferring a 1,875-gallons-per-day sewage allocation to A2, Inc. The town also agreed to grant plaintiffs a right of first refusal on the first 10,000 gallons per day of sewer capacity that becomes available in the future. Additionally, as a result of negotiations with another developer, plaintiffs stand to acquire an additional 10,000-gallons-per-day allocation. Nevertheless, plaintiffs' suit against Developer proceeded, and at the conclusion of discovery, both parties moved for summary judgment.

---

[1] Lots A-1.1 and A-14 were purchased from EREC. Lot A-2 was purchased directly from Vermont Federal Bank.

¶ 7. The superior court entered summary judgment against plaintiffs. The court rejected plaintiffs' argument that the sewage allocation is a common element of the development that may not be unilaterally transferred by Developer to third parties. Moreover, the court reasoned that the Act 250 Permit approving Developer's plan for Water Tower Hill did not, contrary to plaintiffs' assertion, entitle any specific lot within the development to all, or part, of any unused portion of Developer's sewage allocation. The court also rejected plaintiffs' argument that Developer's 1998 transfer of its unused sewage allocation violated its Act 250 Permit, thereby impermissibly placing a cloud on the titles to plaintiffs' lots. According to the superior court, "the onus [was] clearly on [plaintiffs] to secure sewerage rights" via contract lest they be "monopolized by someone else." Because plaintiffs failed to secure their rights via contract, "[t]hey alone should pay for that gamble." This appeal followed.

¶ 8. On appeal, plaintiffs essentially reiterate arguments made below. They contend that the superior court erred in finding that, as a matter of law, Developer's transfer of the then-unused portion of its 200,000-gallons-per-day sewerage allocation outside of the development was not improper.

¶ 9. We review summary judgment decisions de novo, using the same standard as the trial court. *Towns v. N. Sec. Ins. Co.*, 2008 VT 98, ¶ 8, 184 Vt. 322, 964 A.2d 1150. Summary judgment is proper where there are no genuine issues of material fact, and any party is entitled to judgment as a matter of law. *Id.* Additionally, we observe that the "[c]onstruction of a contract is a matter of law," requiring us to perform our own examination and to reach our own conclusions regarding the legal effect of the agreement's terms. *Gannon v. Quechee Lakes Corp.*, 162 Vt. 465, 469, 648 A.2d 1378, 1380 (1994). Finally, we employ typical rules of statutory construction in construing land-use permit conditions. *Agency of Natural Res. v. Weston*, 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.).

¶ 10. At its core, this is a case where plaintiffs, with benefit of hindsight, have realized that they negotiated inadequate protection for their investment properties when they purchased their lots. We decline plaintiffs' invitation to rewrite the parties' agreements to solve this problem.

¶ 11. The amount of sewage to be transferred from Developer to the purchasers of lots A-1.1 and A-14 was a specifically negotiated term of the purchase and sales agreements pertaining to those lots. As mentioned previously, the purchase and sales agreement for lot A-2 made no reference to a sewage allocation. None of these agreements contained a provision requiring Developer to give notice to plaintiffs prior to making any further transfer of its sewage allocation, whether such transfer was to an owner of a lot within Water Tower Hill or to a party unconnected to the development. Nor did the agreements contain any language that can be construed as giving plaintiffs a right of first refusal with respect to such transfers. These agreements also do not contain any promise by Developer to maintain any particular sewage allocation for plaintiffs' benefit. The agreements did, however, contain merger clauses, noting in each instance that the written agreement reflected the parties' entire understanding.

¶ 12. Had plaintiffs desired such protections, or greater sewage allocations, they needed to bargain for them with Developer. Instead, they speculated that, in the future, they would be able to secure whatever increased allocation they might need. Indeed, plaintiffs concede in their brief that they "ran a risk that some other lot owner would request an allotment of the remaining sewage treatment allocation." In the interim, plaintiffs expected Developer to pay the costs associated

with maintaining its original sewage allocation. Plaintiffs' position defies common sense. Claiming that they purchased "their various lots with an eye toward future development," they nevertheless did nothing to ensure that one of the elements they now assert as necessary for the continued economic viability of their investments — an adequate amount of sewage treatment allocation for any conceivable use of their lots — remained available to them.[2]

¶ 13. Instead, plaintiffs insist that they relied on "explicit and implicit representations" by Developer regarding the continued availability of sewage treatment capacity. According to plaintiffs, they were entitled to rely on explicit statements made in Developer's marketing materials and sales pitches and in the information contained in the Act 250 Permit associated with the Water Tower Hill.

¶ 14. With respect to the marketing materials and verbal sales pitches, we note that the purchase and sales agree-

ments for the lots contained provisions wherein plaintiffs explicitly acknowledged and agreed that their purchase of the lots was not induced by any representation made by Developer not expressly reflected in the contract. Specifically, both of the purchase and sales agreements pertaining to lots A-1.1 and A-14 stated:

Notwithstanding anything contained in this Agreement to the contrary or which might be construed to the contrary, the Purchaser acknowledges and agrees that the Purchaser has not been influenced to enter into this transaction nor is the Purchaser relying upon any representations, warranties or other statements, whether verbal or in writing, except as expressly stated in this Agreement in connection with the premises and the transactions contemplated hereunder and the Purchaser further acknowledges and agrees that the Purchaser will rely solely upon his own independent inspection and examination of the Premises, title to same, and other related economic matters . . . . In addition, any verbal or written statement or other information or materials supplied or alleged to have been supplied to the Purchaser by or on behalf of the Seller will be deemed to have been supplied or made available to the Purchaser for informational purposes only . . . .

The merger provision of the purchase and sales agreement for lot A-2 contained language to similar effect:

This Agreement states the whole agreement of the parties hereto regarding the purchase and sale of the property, and all prior agreements, understandings, representations . . . and warranties made by either party prior to the

---

[2] Plaintiffs justify, in part, their decision to acquire a limited amount of sewage capacity by contending that 24 V.S.A. § 3625 prohibited them from acquiring, at the outset, any more than a 6,500-gallons-per-day allocation. Plaintiffs misconstrue the effect of § 3625 on their situation. Among other things, that section places limits on how much, and by what means, a municipality, in certain circumstances, may allocate its sewage capacity. Had plaintiffs sought a sewage allocation from the Town of Colchester that section might apply and limit the amount initially available to them to 6,500 gallons per day. The section does not, however, limit the amount plaintiffs could have initially requested from Developer's allocation, which, by virtue of the fact that it was acquired in 1987, is not affected by § 3625. *Id.* § 3625(e) (noting that this section does not apply "to capacity that is committed or allocated before July 1, 1989").

date of this Agreement are merged herein, and this Agreement alone fully expresses the understanding and agreements of the parties hereto.

Even assuming, as plaintiffs insist, that "Developer marketed and sold the various [l]ots . . . with the express assertion that they were benefited by sufficient sewer allocation for the conceivable conditional and permitted uses," these provisions in the purchase and sales agreements preclude reliance on such assertions as they were not ultimately reflected in the contract.

¶ 15. Plaintiffs' reliance on the Act 250 Permit was also misplaced. The permit cannot be read, as plaintiffs urge, to require Developer perpetually to maintain and pay for a 200,000-gallons-per-day sewage treatment allocation with respect to Water Tower Hill even after Developer had sold all of the lots. Instead, the relevant conditions set forth in the Act 250 Permit (conditions 1, 21, and 21(a)) state the maximum amount of sewage capacity that the development may utilize — 200,000 gallons per day — and established, in effect, a precondition to the initial sale of lots within the development.[3] Notwithstanding the fact that the Town of Colchester had reserved future

capacity for Developer, Developer could not sell lots prior to confirming that the capacity was actually on-line.

¶ 16. Even assuming that a violation of the permit would somehow inure to plaintiffs' benefit in the context of this litigation, given our interpretation of the conditions attached to the Act 250 Permit, we find unavailing plaintiffs' arguments that Developer's transfer of its then-unused sewage allocation violated the permit absent an amendment. No condition of the permit prohibits such transfers. At no point did Developer cause Water Tower Hill to exceed its maximum allowable gallons. Nor is there any evidence in the record that Developer sold lots together with allocations that exceeded the then-available capacity of the Town of Colchester's wastewater treatment facility. The bulk of Developer's unused allocation was transferred back to the town to reallocate to projects in its discretion. Ultimately, we agree with Developer that "[i]t defies logic . . . to think that using *less* of a permitted commodity is a substantial or material change" that requires amending the Act 250 Permit.[4]

¶ 17. The remainder of plaintiffs' arguments center on the proposition that the owners of lots in Water Tower Hill have a property interest in the sewage capacity allocated to Developer. Plaintiffs assert that the sewage treatment capacity allocated to Developer was a common element of Water Tower Hill. As such, Developer could not transfer any of its

---

[3] Specifically, condition 21 states: "[t]his subdivision is approved for the following maximum cumulative impacts which may not be exceeded without the prior written approval of the Commission: . . . 200,000 gallons per day of sanitary wastewater . . . ." Permit condition 1 incorporated the factual findings that the town of Colchester planned to be able to allocate 200,000 gallons per day to Developer and that 200,000 gallons per day was the project's theoretical maximum sewage flow. Permit condition 21(a) reads in pertinent part: "[p]rior to exceeding 30,000 GPD, the permitees shall submit evidence that the additional capacity which the

Town of Colchester has allocated to this project is on-line."

[4] We reach the same general conclusions regarding the municipal permit, the conditions of which also did not explicitly prohibit such transfers. Instead, the town's approval of Water Tower Hill was conditioned not only on the development not exceeding its overall theoretical maximum sewage flow, but also on ensuring that, as the lots were developed, the town actually had adequate capacity available.

allocation outside of the development. Instead, it is argued, after Developer sold its last lot, it was required to transfer any remaining sewage allocation to the development's landowners' association.

¶ 18. As authority for this proposition, plaintiffs cite *Clearwater Realty Co. v. Bouchard*, wherein we adopted the proposition that "lot owners acquire rights in all roads, streets, parks, and other designated ways shown on the plat map *unless a contrary intent is affirmatively shown.*" 146 Vt. 359, 363-64, 505 A.2d 1189, 1192 (1985) (emphasis added). By way of analogy, plaintiffs insist that *Clearwater* compels us to hold that references to the sewage treatment capacity allocated to Developer in the various documents and permits pertaining to Water Tower Hill made Developer's allocation a common element.

¶ 19. Even if we were inclined to extend *Clearwater* by analogy, plaintiffs' argument still fails. Plaintiffs ignore the plain language of the "Declaration of Covenants, Conditions and Restrictions" (the Declaration) pertaining to the development. As discussed below, the Declaration plainly evidences the intent to treat sewage capacity as a utility and not as a common element. Thus, *Clearwater* is of no assistance to plaintiffs because a contrary intent was shown.

¶ 20. The Declaration specifically defined the common elements of Water Tower Hill. Among the development's common elements were a park, a trail network, and other portions of real property designated as such by Developer. The relevant section of the Declaration does not explicitly refer to nor can it be construed to contemplate, Developer's sewage treatment allocation as a common element of the development.

¶ 21. The Declaration does, however, treat sewage allocation as a utility, not a real property interest, and certainly not a common element. In a section entitled *"Utilities"* that reserves easements over

the lots for the initial provision and subsequent upkeep of utilities, the Declaration clearly defines the term "utilities" to include "sewerage."[5] As such, no lot in the development had a vested right in any portion of the sewage capacity reserved for Developer aside from that which the lot owners bargained for in connection with the purchase of their lots.

¶ 22. Moreover, treating the sewage allocation as a common element pursuant to the Declaration leads to an absurd result — each lot owner in Water Tower Hill would have an equal right "to use and enjoy" it. Cf. *Meadowbrook Condo. Ass'n v. S. Burlington Realty Corp.*, 152 Vt. 16, 22, 565 A.2d 238, 241 (1989) ("With respect to the common areas of a condominium, the individual unit owners are tenants in common under the law."). Such an arrangement makes sense when applied to a park, a trail network, or other real or tangible property because, generally speaking, a lot owner's use of such a common element does not diminish, nor is it to the exclusion of, the others' use. With respect to sewage capacity, however, as each lot owner receives an individualized allocation from Developer, the remaining capacity necessarily decreases. Practically speaking, the lot owners cannot share the allocation as they could common elements consisting of real or tangible property. We are not persuaded by plaintiffs' arguments to the contrary.

¶ 23. Plaintiffs also argue that Developer's entire original sewage allocation was an appurtenance to Water Tower Hill inuring to their individual benefit by virtue of the warranty deeds for their lots. There are a variety of problems with this

---

[5] "All of the Property is hereby made subject to an easement for the provision to any portion(s) of the Property of all utilities, including, without limitation, water, *sewerage*, electricity, gas, telephone, and cable for telecommunications purposes . . . ." (emphasis added).

argument. Even if we assume that some amount of sewage treatment capacity is an appurtenance to a lot in a mixed-use commercial development, it strains credulity to interpret boilerplate language in plaintiffs' deeds that purports to convey the lots and all "appurtenances thereof" as granting plaintiffs rights in Developer's *entire* sewage allocation. Such an interpretation would be at odds with the purchase and sales agreements with which the deeds must conform. Cf. *Clayton v. Clayton Invs., Inc.*, 2007 VT 38A, ¶ 19, 182 Vt. 541, 929 A.2d 713 (mem.) (deed must conform with option agreement pertaining to conveyance of land). Those agreements granted only a specific, limited amount of sewage treatment capacity with respect to each lot. Were we to accept the more general proposition underlying plaintiffs' argument — that sewage allocations made with respect to a parcel of land cannot be transferred away from that land — we would be hard pressed to explain how plaintiffs can expect to consummate their transaction with a third-party developer whereby they stand to acquire a 10,000-gallons-per-day allocation to benefit their lots.

¶ 24. In sum, plaintiffs have failed to demonstrate why Developer's transfer of the remainder of its sewage allocation away from Water Tower Hill entitles them to relief

*Affirmed.*