**NURSING CENTER OF BUCKINGHAM AND HAMPDEN, INC., Appellant,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services.**

**No. 91–5403.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 1993.

Decided April 23, 1993.

**646**

Thomas H. Brock, Washington, DC, for appellant. Donald L. Bell, Washington, DC, also entered an appearance for appellant.

Robert L. Roth, Counsel, Dept. of Health and Human Services, with whom Stuart Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty. at the time the brief was filed, and Henry R. Goldberg, Deputy Associate Gen. Counsel, HHS, Washington, DC, were on the brief, for appellee.

Before EDWARDS, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The Nursing Center of Buckingham and Hampden, Inc. ("NCBH"), appeals from an adverse decision of the District Court. The District Court affirmed the decision of the Secretary of Health and Human Services ("Secretary") that NCBH's 1984 agreement to purchase a nursing home in Pennsylvania was not an "enforceable agreement entered into before [July 18, 1984]," within the meaning of the Deficit Reduction Act of 1984. NCBH argues that the Secretary's interpretation of the statutory phrase as applied in this case is arbitrary and capricious. Because the Secretary considered the relevant factors and did not commit a clear error of judgment, we affirm.

## I. BACKGROUND

### A. Statutory Background

Title XVIII of the Social Security Act of 1965, 42 U.S.C. § 1395 *et seq.* (1988), provides federal reimbursement for the "reasonable cost" qualified health care providers incur in furnishing covered services to Medicare beneficiaries. *Id.* § 1395f(1). To participate in the Medicare program, a provider enters into an agreement with the Secretary and nominates a "fiscal intermediary" to administer the reimbursement process. The provider files annual cost reports with the intermediary, which the intermediary reviews, under guidelines promulgated by the Secretary via the Health Care Financing Administration ("HCFA"), in order to determine whether to allow the reimbursement sought.

The Secretary has interpreted Title XVIII to allow reimbursement for capital-related costs, such as depreciation expense and interest expense on capital indebtedness. *See* 42 C.F.R. §§ 413.134(a), 413.-153(a)(1) (1992). That interpretation allowed a purchaser of a health care provider to increase ("step-up") the basis in the acquired provider's depreciable assets to the full purchase price, regardless of what the seller's basis had been. The new owner was then able to recover reimbursement for the stepped-up basis and other capital-related costs, which increased the level of reimbursements the federal government had to provide. *See* H.R.CONF.REP. No.

861, 98th Cong., 2d Sess. 1338 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 2026.

In the 1970s and 1980s, there was a sharp increase in the number of sales of nursing homes participating in the Medicare program. In this changed market, Congress determined that the practice of stepping-up basis to purchase price was abusive and was draining the federal fisc, and decided to put an end to it. To that end, Congress enacted section 2314(c)(1) of the Deficit Reduction Act of 1984 ("DEFRA"), Pub.L. No. 98–369, § 2314(a), 98 Stat. 1079 (1984) (codified at 42 U.S.C. § 1395x(v)(1)(O) (1988)).

DEFRA provided that the purchaser of a Medicare provider shall be limited to a basis equal to "the lesser of the allowable acquisition cost of such asset to the owner of record as of July 18, 1984 (or, in the case of an asset not in existence as of such date, the first owner of record of the asset after such date), or the acquisition cost of such asset to the new owner." 42 U.S.C. § 1395x(v)(1)(O)(i). Concerned about problems of retroactivity and unfairness, Congress provided that § 1395x(v)(1)(O)(i) "shall not apply to changes of ownership of assets pursuant to an enforceable agreement entered into before the date of the enactment of [DEFRA]." Pub.L. No. 98–369, § 2314(c)(1), 98 Stat. 1079 (1984). Congress did not define the term "enforceable agreement."

Through the HCFA, the Secretary issued guidelines explaining to fiscal intermediaries how the enforceable-agreement exception should be applied. *See* MEDICARE INTERMEDIARY MANUAL: AUDIT PROCEDURES PUB. 13–4 § 4408.1 (Apr. 1987) (hereinafter, "MANUAL"). In relevant part, the guidelines provide as follows:

> When reviewing a provider's claim to this exception, use the following guidelines to assist you in determining whether the transaction was *governed by the terms* of an enforceable agreement.
>
>   * The agreement must be in writing.
>   * It must be signed by authorized representatives of both buyer and seller and should be notarized to establish the effective date of the agreement.

>   * It should contain specific performance provisions which permit both buyer and seller to compel the other to complete the sale. Question agreements which do not contain penalty or forfeiture provisions, such as the loss of deposit or other monetary penalties. . . .
>
>   * It should specify most or all of the conditions upon which the transaction will be consummated. . . .
>
>   * Contingent agreements may also be considered enforceable. In general, the more contingencies upon which an agreement is based, the less enforceable it will be viewed. To be considered enforceable for purposes of DEFRA, a contingent agreement would, at a minimum, be one that is outside the power of either party to influence; or, the contingency is one that requires reasonable, business-like actions on the part of either party. Contingent agreements require careful scrutiny.

*Id.* § 4408.1, at 6–32.

#### B. *The Agreement of Merger*

American Healthcare Corp. ("AHC"), its wholly owned subsidiary American Treatment Centers ("ATC"), and certain individuals entered into an "Agreement of Merger," on April 23, 1984, to purchase a nursing home in Pennsylvania. Professional Care Services ("PCS") owned the nursing home, which its wholly owned subsidiary, Buckingham Valley Convalescent Nursing Center, Inc. ("BVCNC"), operated as a participant in the Medicare program. BVCNC had purchased the nursing home in 1967 for $818,000 and therefore had a Medicare basis of $818,000 in the nursing home's depreciable assets. Under the Agreement, AHC and its fellow signatories agreed to purchase the nursing home for $3,230,000. Though signed, as stated, on April 23, 1984, the Agreement did not specify a precise effective date, stating only that

> [A]s soon as practicable after (a) the requisite vote of the PCS stockholders as contemplated by Section 6.02 hereof, and (b) the satisfaction or waiver of each condition to the obligations of the parties hereunder, the parties will take such ac-

tion as is required by law to make the Merger effective, including the filing of duly executed certificates of merger meeting the requirements of applicable state laws. *The date and time of such filing are herein referred to as the "Effective Date."*

*Agreement of Merger* § 1.02 (Apr. 23, 1984) (hereinafter, *"Agreement"*) (emphasis added).

The Agreement called for a series of complex corporate transactions to effectuate the purchase. The individual signatories were to form a corporation, Smith–Passerin ("SP"), to merge with PCS. PCS, the survivor of the merger, and BVCNC, its wholly owned subsidiary, would, in turn, merge with AHC and its wholly owned subsidiary, ATC. AHC, as the survivor of the last merger, would then create a wholly owned subsidiary, NCBH, appellant here, ultimately to take title to the nursing home.

The Agreement contained numerous "Conditions Precedent to the Merger," *id.* art. VIII, at 25, six of which are relevant here. First, before May 1, 1984, a specified investment banking firm had to issue a letter opining that the terms of the PCS–AHC merger "are fair, from a financial point of view, to the minority shareholders of PCS." *Id.* §§ 8.01(e), 8.02(e). Second, the agreement had to be approved by a majority of the common stockholders of PCS and AHC, *id.* §§ 8.01(d), 8.02(d), and two-thirds of AHC's preferred stockholders had to approve of the concomitant issuance of subordinated debt. *Id.* §§ 8.01(k), 8.02(*l*). Third, the respective counsel to PCS and ATC had to provide certain legal opinions, and an accounting firm had to provide an "unqualified opinion ... that any taxable gain recognized by [the individual signatories] as a result of the Merger ... will be taxable at long-term capital gains rates." *Id.* § 8.01(c); *see also id.* § 8.02(c).

Fourth, the SP–PCS merger had to be completed, and "all filings or other requirements ... satisfied so as to make [it] a legal and binding merger under all applicable laws." *Id.* §§ 8.01(j), 8.02(k). Fifth,

regulatory and other approval had to have been obtained for the PCS–AHC merger. *Id.* §§ 8.01(f), 8.02(f). Finally, AHC had to elect one of the individual signatories to its Board of Directors and execute employment contracts with all of them. *Id.* §§ 8.01(m)–(n), 8.02(j).

In addition, the Agreement expressly gave AHC and PCS the right to terminate the Agreement in two circumstances. First, they had the right unilaterally to terminate the contract after December 31, 1984, provided, *inter alia*, that the party wishing to terminate the agreement was in compliance with it. *Id.* § 10.01(b). Second, AHC and PCS had the right to terminate the contract by mutual consent at any time. *Id.* § 10.01(a). Upon invocation of either ground of termination, the termination clause provided, "this Agreement shall become void and have no effect, without any liability on the part of any party." *Id.* § 10.02.

The mergers occurred as contemplated; AHC created appellant NCBH; and on September 6, 1984, the transfer was consummated. Only then did appellant become the legal owner of the nursing home in question.

## C. *The Present Controversy*

After acquiring the nursing home, NCBH, seeking reimbursement under the Medicare program for the costs it incurred in providing qualified services to its residents, submitted its first annual cost report to its designated fiscal intermediary. The intermediary issued a "Notice of Program Reimbursement" reporting the level of reimbursement it deemed NCBH to be entitled to receive from Medicare, utilizing the prior owner's basis of $818,000. Unsatisfied with the reimbursement award, NCBH appealed to the Provider Reimbursement Review Board ("PRRB"), arguing (for the first time) that it was entitled to capital reimbursement based on a stepped-up basis of $3.23 million.

By a divided vote, the PRRB affirmed the intermediary's decision on the ground, *inter alia*, that the Agreement was not an "enforceable agreement," under DEFRA,

by July 18, 1984. *Buckingham Valley Ctr.*, No. 86–889, slip op. (Provider Reimbursement Rev.Bd. Jan. 30, 1990). In reaching that conclusion, the PRRB found that "[t]here is nothing in the record to indicate that those events [consummating the deal] did not occur simultaneously [on September 6, 1984] as required by the Agreement of Merger or that the statutory merger and the closing events occurred one before the other." *Id.* at 7. Therefore, DEFRA limited NCBH to the prior owner's Medicare basis of $818,000. *See* 42 U.S.C. § 1395x(v)(1)(O). The Secretary, through the HCFA, affirmed in a brief decision basically adopting the PRRB's opinion. *Buckingham Valley Nursing Ctr.*, No. 90–D 13, slip op. (Health Care Financing Admin. Mar. 28, 1990). The HCFA added by way of explanation that the Secretary's guidelines interpreting DEFRA's enforceable-agreement exception supported the PRRB's conclusion that NCBH was not entitled to a stepped-up Medicare basis. *Id.* at 4 (citing MANUAL § 4408.1).

NCBH then appealed, pursuant to 42 U.S.C. § 1395*oo* (f)(1) (1988), to the United States District Court for the District of Columbia. The District Court granted summary judgment affirming the Secretary's reimbursement decision. *See Nursing Center of Buckingham and Hampden, Inc. v. Sullivan*, No. 90–1215, slip op., 1991 WL 255584 (D.D.C. Nov. 14, 1991). The court ruled that deference was due the Secretary's enforceable-agreement guidelines, which constituted an administrative interpretation of DEFRA's term "enforceable agreement." *Id.* at 8. The court concluded that the Secretary's application of the enforceable-agreement guidelines to appellant was not arbitrary or capricious because (1) the Agreement contained several contingencies within the power of the parties to control; (2) NCBH did not acquire title to the nursing home until September 1984; and (3) the Agreement allowed the merger (and hence the transfer of assets) to be terminated under certain circumstances. *Id.* at 9–10. The court accordingly upheld the Secretary's determination that appellant was not entitled to capital cost reimbursement based on a stepped-up Medicare basis in the acquired nursing home's depreciable assets.

This appeal followed.

## II. DISCUSSION

Appellant consistently contends on appeal that the District Court erred in affirming the Secretary, but appears to conflate two alternative arguments, both in the District Court and before us. On the one hand, appellant argues that whether or not the Agreement of Merger was an "enforceable agreement" before July 18, 1984 under DEFRA should be determined by reference to state law, in this case the law of the Commonwealth of Pennsylvania.[1] The necessary premise of this argument is that the Secretary's interpretation, as expressed in section 4408.1 of the guidelines, is invalid insofar as it purports to define "enforceable agreement" without reference to state law of contracts. On the other hand, appellant contends that the Secretary misapplied her own guidelines in this case. The necessary premise of that contention is that the guidelines are a valid interpretation of "enforceable agreement."

While it is not clear from the briefs whether appellant intended to pursue these arguments in the alternative, counsel for appellant made plain at oral argument that it did not challenge the validity of the interpretive guidelines, but rather the lawfulness of the application of the guidelines in this case. Therefore, we do not consider at this time the relevance of state laws of contract to the Secretary's interpretation of the key phrase, but rather whether the Secretary, having interpreted the phrase by guidelines, acted arbitrarily and capriciously in the way she applied that interpretation to the present facts.

The Secretary's manual provides definition to the term "enforceable agreement." Though Congress did not define the term in

---

1. We note that even if state law applies, the relevant state may be Tennessee, in view of the Agreement's provision that "[t]he validity and construction of this Agreement shall be governed by the laws of the State of Tennessee." *Agreement* § 11.08.

either DEFRA itself or the legislative history, appellant repeatedly suggests that traditional common law definitions of "enforceable contract" can be employed to render the term unambiguous. Though this view has much to support it, the Secretary apparently deemed the words "enforceable agreement" to have some meaning other than the common law meaning of "enforceable contract," sufficient to create an ambiguity warranting clarification. As we noted, the validity of the Secretary's interpretation under the *Chevron* standard is not before us, and we assume for the sake of this opinion, that her interpretation is a valid one.

Indeed, although the Secretary's understanding of enforceability may be more restrictive than that embodied in the general law of contracts, in that the guidelines would deem unenforceable, for Medicare purposes, certain contingent contracts that contract law might regard as enforceable, *see* MANUAL § 4408.1, at 6–32, the guidelines are nonetheless consistent with the congressional purpose motivating the DEFRA exception. Whether those guidelines can be validly applied to a contingent contract enforceable under state law but not within the Secretary's definition can await another day. For reasons which we will discuss more fully below, the agreement in this case would be unenforceable under state law, as well as the Secretary's regulations.

At least as applied in this case, the Secretary's guidelines appear totally consistent with the statutory exception. The apparent purpose behind the exception was to avoid the unfairness of radically changing the Medicare law against which bargainers contracted. No such unfairness arises where the affected bargainer—the purchaser of a Medicare provider—has the power unilaterally to extricate itself from the agreement. Any detrimental reliance on pre-DEFRA law's allowance of stepping-up basis to the full cost of acquisition is largely, if not entirely, eliminated by that power. Confronted with the unforeseen change in law, the purchaser, to the extent it wishes to do so, can avoid the purchase agreement. The unfairness Congress wished to

alleviate occurs when the purchaser lacks such a contractual "out." Therefore, the Secretary's guidelines, if applied so as to further that purpose, would appear to be well along the way to meeting the relevant standard of review.

■ We review the Secretary's application of the guidelines in this case under the familiar arbitrary or capricious standard of the APA, 5 U.S.C. § 706(2)(A) (1988). *See* 42 U.S.C. § 1395oo (f)(1) (explicitly adopting the APA standard of review for judicial review of determinations by the Secretary). That standard requires us to sustain the Secretary's determination that the Agreement did not fall within DEFRA's enforceable-agreement exception, as elucidated in the guidelines, if it "was based on a consideration of the relevant factors" and "there has [not] been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (internal quotation marks omitted); *see also Adams House Health Care v. Sullivan*, 895 F.2d 767, 770 (D.C.Cir.1990) (same).

■ Appellant claims the Secretary's ruling that the Agreement of Merger was not an enforceable agreement, under DEFRA, by July 18, 1984, was arbitrary or capricious. We disagree. The Secretary's ruling is based on her reading that the Agreement contains several contingencies, at least some of which were within the control of the purchaser, AHC. Far from finding that reading to be arbitrary or capricious, we deem it a reasonable one. The condition precedent requiring PCS and AHC to obtain stockholder approval of the agreement appears sufficient, standing alone, to have supported the Secretary's ruling. *See Agreement* §§ 8.01(d), 8.02(d) (Apr. 23, 1984). Of course, the fact that the Agreement contains several other significant contingencies, *e.g.*, the requirement that regulatory and other approval be obtained for the SP–PCS and PCS–AHC mergers, *id.* §§ 8.01(f) & (j), 8.02(f) & (k), supports the Secretary's determination that the Agreement was too contingent to be considered

an enforceable agreement by July 18, 1984. *Id.* § 10.01(b). By its own terms, the Agreement did not become effective until the "date and time" of the "filing of duly executed certificates of merger meeting the requirements of applicable state laws," which could not occur until the parties "satisf[ied] or waive[d] ... each condition to the obligations of the parties hereunder." *Id.* § 1.02.

We note that there is substantial evidence in the record indicating that at least some of these contingencies were not met until September 1984, almost two months *after* DEFRA's July 18, 1984 cut-off point. *See Buckingham Valley Ctr.*, No. 86–889, slip op. at 7 (Provider Reimbursement Rev. Bd. Jan. 30, 1990) (finding that "[t]here is nothing in the record" indicating that those events occurred before September 6, 1984). Indeed, counsel for appellant admitted at oral argument that the contingencies had not been fulfilled before September 1984. *See* Tr. of Oral Arg. (Mar. 15, 1993). Therefore, we hold, in agreement with the District Court, that the Secretary reasonably applied the guidelines in concluding that the Agreement was not an "enforceable agreement" within the meaning of DEFRA by July 18, 1984, the effective date of the Act.

Although it is true that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained," *SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943), we nonetheless are reassured in our determination that the Secretary's application of the guidelines is reasonable by the fact that this same result could be reached applying both the statutory and common law of contracts derived from either Pennsylvania or Tennessee. Under each, the contract is not "enforceable" because it remained subject to shareholder approval both under its express terms and under the statutory law of either Pennsylvania[2] or Tennessee.[3]

It is in fact common learning that a contract that is subject to shareholder approval is not enforceable before that approval is obtained, at least where as here a state statute requires such approval. *See Smith v. Good Music Station, Inc.*, 36 Del.Ch. 262, 129 A.2d 242, 245 (1957) (purported letter contract to sell assets "could not have any ultimate binding legal effect on [corporation] until it received the requisite statutory [shareholder majority] approval"); *Downing Dev. Corp. v. Brazelton*, 253 Md. 390, 252 A.2d 849, 855 (1969) (contract to sell virtually all assets entered without statutorily required shareholder approval was "invalid and of no legal effect"); *Michigan Wolverine Student Coop., Inc. v. Wm. Goodyear & Co.*, 314 Mich. 590, 22 N.W.2d 884, 890 (1946) (attempted sale of corporate real estate without statutorily required shareholder approval is "void"); *Neff v. World Publishing Co.*, 349 F.2d 235, 235 (8th Cir.1965) ("Nebraska law ... permits a sale of assets such as proposed only with the written consent of the holders of a majority of the outstanding voting stock, or by majority vote of such stockholders voting at a meeting called for the purpose of considering such sale. It is essential that the statutory requirements be complied with before a binding contract can be entered into."); *Finklea v. Carolina Farms Co.*, 196 S.C. 466, 13 S.E.2d 596, 599 (1941) (finding no acceptance of offer to buy all assets of corporation where it was not approved by two-thirds of shareholders as required by statute); *Hospitality Inns, Inc. v. South Burlington R.I., Inc.*, 153 Vt. 410, 571 A.2d 40 (1989) ("A sale of all of the corpo-

---

**2.** *See* Pa.Stat.Ann. tit. 15, § 1902 (requiring an "affirmative vote of the shareholders entitled to cast at least a majority of the votes" for corporate merger) (repealed 1988); *id.* § 1311(B) (requiring same vote of approval for "sale, lease, or exchange of all, or substantially all, the property and assets" of a corporation) (repealed 1988).

**3.** *See Southmoor, Inc. v. Baptist Memorial Hosp.*, 60 Tenn.App. 148, 444 S.W.2d 716 (1969) (citing Tenn.Code Ann. § 48–509 as requiring affirmative vote of majority of stockholders of record entitled to vote before sale of all of a corporation's assets).

rate assets is only valid when the statutory assent is given.").

### III. CONCLUSION

In short, upon reviewing the Secretary's application of her guidelines for arbitrari-ness and caprice, we find none. Therefore, the decision of the District Court is

*Affirmed.*