TENET HEALTHSYSTEMS HEALTH-CORP., *f/k/a* OrNda Healthcorp., Appellee,

v.

Tommy G. THOMPSON, Secretary of Health and Human Services, Appellant.

No. 99–5064.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 2000.

Decided July 6, 2001.

Anne Murphy, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs were David W. Ogden, Assistant Attorney General, Anthony J. Steinmeyer, Assistant Director, and Wilma A. Lewis, U.S. Attorney at the time the briefs were filed. R. Craig Lawrence and Scott S. Harris, Assistant U.S. Attorneys, entered appearances.

Joanne B. Erde argued the cause for appellee. With her on the brief was Harry R. Silver.

Before: TATEL and GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Tenet HealthSystems HealthCorp., a Medicare provider, contends that the Department of Health and Human Services (HHS) inadequately reimbursed it for its losses on the sale of a hospital. The district court agreed and remanded the case to HHS for redetermination of the amount due. We disagree and reverse the judgment of the district court.

I

We begin with an exposition of the Medicare regulations applicable to this appeal, and then describe the proceedings below.

A

During the period relevant to this case, and with caveats unnecessary to discuss here, HHS reimbursed health care providers for their capital-related costs in providing services to Medicare patients.[1] Under the pertinent regulations, these costs include Medicare's share of a provider's depreciation expenses and capital losses.[2] The regulations use the "cost basis" of the

---

1. *See* 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A)(i); 42 C.F.R. §§ 412.113(a), 413.130; *see also* 42 C.F.R. § 412.304 (implementing prospective payment system for capital costs beginning October 1991, pursuant to 42 U.S.C. § 1395ww(g)).

2. *See* 42 C.F.R. §§ 413.50, .53, .130, .134; 42 U.S.C. § 1395x(v)(1)(A)(i), (v)(1)(O).

depreciable assets of a provider's hospital in determining both the provider's annual depreciation allowances and its gain or loss when the hospital is sold. 42 C.F.R. § 413.134(f), (g). Annual depreciation is calculated as a yearly fraction of the hospital's basis, distributed over its useful life. 42 C.F.R. § 413.134(d). Gain or loss upon sale is determined by subtracting (with appropriate adjustments) the hospital's basis from its selling price.[3] Hence, the higher the basis, the higher the depreciation expenses that HHS will reimburse and the smaller the gain or greater the loss it will calculate upon sale. *See Nursing Ctr. of Buckingham & Hampden, Inc. v. Shalala,* 990 F.2d 645, 646 (D.C.Cir. 1993).

The Medicare regulations permit a provider that purchased a hospital after July 31, 1970 and before July 18, 1984—as Tenet did—to "step-up," or increase, the basis of the facility above that of the previous owner. *See Nursing Ctr.,* 990 F.2d at 646.[4] Pursuant to 42 C.F.R. § 413.134(g)(1) and (2), the basis of such a hospital's depreciable assets may not exceed the lowest of: (1) the allocated price paid for the facility by the purchaser, (2) the allocated fair market value of the facility at the time of the sale, or (3) the "current reproduction cost depreciated on a straight-line basis over the life of the asset to the time of the sale." *Id.*[5] The last category, depreciated reproduction cost, reflects the depreciated cost of reproducing the assets at current market

---

**3.** *See* Health Care Fin. Admin., Medicare Provider Reimbursement Manual, HCFA Pub. 15–1, § 104.10(C), ex. 5 [hereinafter Provider Manual]; *see also Whitecliff, Inc. v. Shalala,* 20 F.3d 488, 489 (D.C.Cir.1994).

**4.** In the Deficit Reduction Act of 1984 (DEFRA), Congress limited the basis in a hospital purchased on or after July 18, 1984 to "the lesser of the allowable acquisition cost of such asset to the owner of record as of the date of the enactment of [DEFRA], . . . or the acquisition cost of such asset to the new owner." Pub.L.98–369, § 2314(a), 98 Stat. 494, 1079 (current version at 42 U.S.C. § 1395x(v)(1)(O)(i)). HHS has stated that: "The practical effect of DEFRA is that Medicare will no longer allow a 'write-up' from the historical cost basis of the acquired depreciable assets. It is possible, however, for a 'write-down' of assets to occur, when the limitation is applied." Health Care Fin. Admin., Medicare Intermediary Manual, HCFA Pub. 13, § 4508.1(B) [hereinafter Intermediary Manual]; *see* 42 C.F.R. § 413.134(g)(3). According to the legislative history, Congress imposed the DEFRA limitation out of concern "that Medicare · ha[d] been paying for the same capital assets more than once." H.R. CONF. REP. No. 98–861, at 1339 (1984). In the Balanced Budget Act of 1997, Congress further amended the Medicare statute to provide simply that, for hospitals acquired on or after August 5, 1997, the basis "shall be the histori-

cal cost of the asset . . . less depreciation allowed, to the owner of record as of the date of enactment of the [Act]." Pub.L. 105–33, § 4404(a)(1)(D), 111 Stat. 251, 400 (codified at 42 U.S.C. § 1395x(v)(1)(O)(i)); *see* 42 C.F.R. § 413.134(g)(4).

**5.** 42 C.F.R. § 413.134(g)(1) and (2) provide in relevant part:

(g) *Establishment of cost basis on purchase of facility as an ongoing operation*—(1) *Assets acquired after July 1, 1966 and before August 1, 1970.* The cost basis for the assets of a facility purchased as an ongoing operation after July 1, 1966, and before August 1, 1970, is the lowest of the—

(i) Total price paid for the facility by the purchaser, as allocated to the individual assets of the facility; [or]

(ii) [and (iii) ] . . . fair market value of the facility at the time of the sale, as allocated to the individual assets. . . .

(2) *Assets acquired after July 31, 1970 and, for hospitals and SNFs [skilled nursing facilities], before July 18, 1984.* For depreciable assets acquired after July 31, 1970 and, for hospitals and SNFs, before July 18, 1984, in addition to the limitations specified in paragraph (g)(1) of this section, the cost basis of the depreciable assets may not exceed the current reproduction cost depreciated on a straight-line basis over the life of the asset to the time of the sale.

prices.[6]

A health care provider generally establishes its entitlement to Medicare reimbursement by submitting a cost report to a fiscal intermediary. *See* 42 U.S.C. §§ 1395f(a), 1395h; 42 C.F.R. §§ 413.24(f), 421.1–.128. If the provider is dissatisfied with the intermediary's determination of the amount due, it may seek review from HHS' Provider Reimbursement Review Board. *See* 42 U.S.C. § 1395oo(a), (b). The Board's decision in a case is final, unless the Administrator of the Health Care Financing Administration accepts the case for review. *See* 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875. After a final administrative decision, providers may obtain judicial review. 42 U.S.C. § 1395oo(f).

## B

In September 1983, Tenet purchased two hospitals, Nautilus Memorial Hospital and Gibson General Hospital, from Humana of Tennessee, Inc.[7] Tenet paid Humana $12,100,000 for both hospitals. Based on an appraisal performed by Valuation Counselors Southwestern, Inc., Tenet allocated $4,516,202 of the total purchase price to Nautilus Memorial.

Tenet changed Nautilus Memorial's name to Three Rivers Community Hospital and operated it as an acute care facility for the next six years. In its first Medicare cost report for Three Rivers, covering the period from October 1, 1983 to August 31, 1984, Tenet claimed depreciation allowances calculated by using a stepped-up basis that reflected the allocated price it paid in 1983. That price, Tenet said, was lower than both the hospital's fair market value and its depreciated reproduction cost as determined by the Valuation Counselors appraisal, and was thus the appropriate figure for the hospital's basis pursuant to 42 C.F.R. § 413.134(g).[8] However, the Medicare intermediary, Blue Cross & Blue Shield of Tennessee, refused to recognize the step-up on the ground that Tenet had failed adequately to document the hospital's depreciated reproduction cost. Instead, Blue Cross limited Tenet's basis to that of the previous owner, adjusted for

6. "Current reproduction cost" is the "cost at current prices, in a particular locality or market area, of reproducing an item of property or a group of assets." 42 C.F.R. § 413.134(b)(6). The term is further defined in the Provider Manual as "the cost of reproducing substantially identical assets of like type, quality, and quantity at a price level in a bona fide market as of the date of acquisition." Provider Manual § 134. Section 413.134(g)(2) of the Medicare regulations requires that the appraiser account for the age of the facility using straight-line depreciation, which distributes current reproduction cost "in equal amounts over the period of the estimated useful life of the asset," 42 C.F.R. § 413.134(b)(3).

    HHS describes depreciated reproduction cost "as an accounting check against purchase price and fair market value," which "incorporates the common-sense principle that a purchaser would not pay more for a used building than the cost of constructing exactly the same building today." HHS Br. at 24. Others have described it as "an economically meaningless application of up-to-date prices to out-of-date properties." BONBRIGHT ET AL., PRINCIPLES OF PUBLIC UTILITY RATES 294 (1988); *see also Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1520 n. 68 (D.C.Cir.1984). We have no occasion to comment on the accuracy of either description.

7. Throughout this opinion, we use "Tenet" to include Tenet HealthSystems HealthCorp. and all of its predecessors in interest. American Healthcare Management, Inc. was the original purchaser of the hospitals in 1983. In 1984, OrNda Healthcorp. purchased American Healthcare, and in 1997 OrNda was itself purchased by Tenet.

8. According to Tenet, the fair market value and depreciated reproduction cost were the same. *See* Tenet Br. at 20.

subsequent capital improvements, disposals, and accumulated depreciation, which it referred to as the hospital's "net book value" as of the date of Tenet's 1983 purchase. As a consequence of the lower basis, Blue Cross reduced Tenet's allowable depreciation expenses for 1984.

Tenet did not appeal Blue Cross' 1984 determination. Nonetheless, Tenet continued to claim depreciation allowances using the stepped-up basis (with adjustments) in each of its next four annual cost reports. Each time, Blue Cross limited Tenet's basis to adjusted 1983 net book value, and reduced Tenet's allowable depreciation expenses accordingly. Tenet did not appeal any of those four annual determinations.

In 1989, Tenet sold Three Rivers for $1,000,000, with the purchase agreement between Tenet and the buyer allocating $770,000 of the sales price to depreciable assets. That year, Tenet submitted a cost report that again used the 1983 purchase price (with adjustments) as the hospital's basis. Using that basis, Tenet calculated its loss on the sale as $5,062,801 and billed Medicare for its share. *See* 42 C.F.R. § 413.134(f). Once again, Blue Cross reduced Tenet's basis to the adjusted 1983 net book value of the assets. The substitution of net book value for Tenet's claimed basis reduced Tenet's loss from $5,062,801 to $642,512.[9] For the first time, Tenet appealed the reduction of the basis to the Provider Reimbursement Review Board (PRRB).

After an evidentiary hearing, the PRRB sustained the intermediary's decision. The Board held that, under the Medicare regulations, a hospital's basis may not exceed its depreciated reproduction cost, and that Tenet "had failed to adequately document ... its value for current depreciated reproduction cost." *Three Rivers Cmty. Hosp.*, PRRB Dec. No. 97–D97, at 11 (Sept. 10, 1997) [hereinafter "PRRB Op."]. The Board further held that because a reliable value for depreciated reproduction cost was unavailable, a stepped-up basis was inappropriate and the intermediary's decision to use the previous owner's basis (net book value) was reasonable. *Id.* The Administrator of the Health Care Financing Administration declined to review the Board's decision, rendering that decision final.

Tenet then filed suit against HHS in the United States District Court for the District of Columbia. On cross-motions for summary judgment, the court found the PRRB's decision arbitrary and capricious, principally because the court read the Medicare regulations to bar the use of net book value as a purchaser's basis. *Tenet HealthSystems HealthCorp. v. Shalala*, No. 97cv2723, slip op. at 1 (D.D.C. Jan. 12, 1999). HHS now appeals.

## II

Our standard for reviewing a decision of the PRRB is the same as that which the district court must apply: We may set aside a Board decision only if it is "unsupported by substantial evidence," or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(E), (A); *see* 42 U.S.C. § 1395oo(f)(1) (providing that judicial review of PRRB decisions shall be pursuant to the provisions of 5 U.S.C. §§ 701 *et seq.*); *HCA Health Servs. of Okla., Inc. v. Shalala*, 27 F.3d 614, 616 (D.C.Cir.1994). In addition, we must defer to HHS' reading of its own regulations, unless that reading is "plainly erroneous

---

9. Tenet calculated its basis as $5,832,801, and its loss on the sale as $5,062,801. *See* J.A. at 206. Blue Cross reduced Tenet's basis to $1,412,512, and its loss to $642,512. *See* J.A. at 209.

or inconsistent with the regulation[s]." *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (internal quotation omitted); *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Because we apply the same standard of review as the district court, we proceed de novo, as if Tenet had brought the case here on direct appeal. *See County of L.A. v. Shalala*, 192 F.3d 1005, 1012 (D.C.Cir. 1999); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 348–49 (D.C.Cir.1987).

Tenet emphasizes that it does not challenge the lawfulness or reasonableness of the Medicare regulations, but rather only the way in which the PRRB applied them to its reimbursement request. Tenet Br. at 11–14. The provider raises two principal objections to the PRRB decision, contending that: (1) the Board's determination that the Valuation Counselors appraisal was inadequate to warrant a stepped-up basis is unsupported by substantial evidence; and (2) the Board's determination that net book value was a reasonable basis for the hospital is arbitrary, capricious, and not in accordance with law. We consider these two arguments below.

### A

■ The PRRB did not dispute that Tenet would have been eligible for a stepped-up basis had it submitted adequate supporting data. PRRB Op. at 10–11. It concluded, however, that Tenet failed to do so. *Id.* at 11. Although Tenet contends that this conclusion is unsupport-

ed by substantial evidence in the record, we disagree.

■ As the PRRB explained, and as Tenet concedes, the basis for Three Rivers Hospital may not exceed the lowest of its: (1) purchase price, (2) fair market value, or (3) depreciated reproduction cost. 42 C.F.R. § 413.134(g)(1), (2). Under the Medicare regulations, "[p]roviders receiving payment on the basis of reimbursable cost must provide adequate cost data," 42 C.F.R. § 413.24(a)—i.e., data that is "accurate and in sufficient detail to accomplish the purposes for which it is intended," 42 C.F.R. § 413.24(c). Blue Cross accepted the figures offered by Tenet for the hospital's purchase price and fair market value. But it concluded, and the Board agreed, that Tenet failed to meet its burden of submitting reliable evidence of the third regulatory criterion: the hospital's depreciated reproduction cost.[10] Accordingly, Tenet could not establish that its proffered basis was less than or equal to depreciated reproduction cost, and hence could not meet the step-up requirements of § 413.134(g). PRRB Op. at 10–11.

In support of its claim to a stepped-up basis, Tenet submitted the appraisal prepared by Valuation Counselors at the time of the 1983 sale. Although the Board and the intermediary listed a number of flaws in the appraisal, we consider only the most important one here: As the Board correctly noted, the 1983 appraisal simply "did not provide detailed documentation to support how it arrived at its depreciated reproduction cost[ ]." *Id.* at 11. The appraisal listed a bottom-line figure for the depreciated reproduction cost of the hospi-

---

10. Tenet argues that under 42 C.F.R. § 413.134(f)(2)(iv), when an intermediary is dissatisfied with an appraisal, it is the intermediary rather than the provider that is obligated to seek a new appraisal. The cited regulation, however, applies only when a lump sum sales price must be allocated among various assets, and when "the buyer and seller cannot agree on an allocation of the sales price, or ... there is insufficient documentation of the current fair market value of each asset" to make the allocation. *Id.* There was no dispute about the allocation of the lump sum sales price in this case.

tal buildings, but it included no supporting analysis or data. Appraisal at 9 (J.A. at 16). Although Valuation Counselors attached an item-by-item, priced inventory of the hospital's equipment, it attached no similar schedule for the hospital's buildings—notwithstanding that the buildings constituted almost 90% of the facility's total appraised value. *See id.* at 10 (J.A. at 17). Indeed, the appraisal did not even use the term "depreciated reproduction cost" to describe the value it listed, but rather the term "depreciated replacement cost." *Id.* at 7 (J.A. at 14). Although Tenet contends that Valuation Counselors regarded the latter as equivalent to the former, without a more detailed description of the appraiser's methods and results it is impossible to determine whether that was so.[11]

In sum, the appraisal submitted by Tenet left the intermediary's auditors without "auditable evidence" from which they could determine the depreciated reproduction cost of the Three Rivers facility. Intermediary's Position Paper, PRRB Case. No. 92–1576, at 13 (J.A. at 161). Because that figure is essential to the calculation set forth in § 413.134(g), this flaw is sufficient to support the Board's conclusion that the

appraisal was inadequate to warrant a stepped-up basis.[12]

Twelve years after it purchased the Three Rivers facility, Tenet endeavored to cure the flaw in the 1983 Valuation Counselors appraisal by submitting a list of the items that purportedly comprised the 1983 valuation of the buildings' reproduction cost. The PRRB was not satisfied with the degree of detail submitted. PRRB Op. at 8. Although Tenet neither included this list in the parties' Joint Appendix, nor referred to it in its brief, at oral argument Tenet's counsel directed us to the appropriate pages of the agency record. We have examined those pages and concur in the PRRB's assessment. The new material does no more than list thirteen gross components of the Three Rivers buildings ("floors," "roof," "ceilings," etc.) and attach dollar figures to each. Administrative Record (A.R.) at 740. It does not indicate how those figures were calculated; it does not even state whether they were the original 1983 calculations or simply retrospective reconstructions.

It was not only the Valuation Counselors appraisal itself that caused the Board concern about accepting Tenet's proposed basis. Another valuation of the hospital, conducted for Tenet by the firm of Marshall

---

11. We have previously referred to "reproduction cost" as the "present cost of reproducing the same physical assets," while referring to "replacement cost" as the "present cost of building a like enterprise taking advantage of modern technology." *Farmers Union Cent. Exch. v. FERC,* 584 F.2d 408, 412 n. 3 (D.C.Cir.1978); *see also, e.g., Dickler v. CIGNA Prop. & Cas. Co.,* 957 F.2d 1088, 1100 (3d Cir.1992). The Valuation Counselors appraisal described its "replacement cost" figure as "the cost of producing new duplicate assets on the basis of current prices using the same *or similar* materials," Appraisal at 1 (J.A. at 8) (emphasis added), while the Provider Manual defines "reproduction cost" as the "cost to reproduce the actual facility in like kind, and should not be inflated by such factors as …

different construction types," Provider Manual § 134.2.

12. In addition to this flaw, the Board also found, inter alia, that the depreciation figure used in the appraisal was so low as to cast doubt on the appraisal's overall validity. PRRB Op. at 11. The intermediary had noted that Valuation Counselors' calculation "yields an accumulated depreciation of only $406,300 from the construction date [1969] to the point of sale [1983]." *Id.* at 8. That figure, the intermediary observed, corresponds to "a useful life in excess of 175 years"—a facially implausible assumption given "the standard estimated useful life of a building of 40 years." *Id.* at 8.

and Stevens, Inc., raised still further doubts. PRRB Op. at 11. The Marshall and Stevens report valued the depreciated reproduction cost of the hospital buildings at $3,000,000 lower than had Valuation Counselors, as of approximately the same date. *Id.* at 9. "There are no reasonable explanations for this large variance," the Board said, "which leads to the conclusion that the data is unreliable for computation of loss on sale of the facility." *Id.* at 9 (summarizing intermediary's view).

■ Finally, we note that Tenet itself created the evidentiary difficulty it now faces. Although Blue Cross pointed out the inadequacy of Tenet's appraisal data as early as 1984, Tenet "neither appealed the Intermediary's decision when it was made, nor did it request a reopening of the cost report within three years of the original" decision. *Id.* at 11. Tenet also failed to challenge Blue Cross' determination in any of the four succeeding cost years, and never offered a new appraisal that corrected the flaws in the original. Although HHS has not argued that this constitutes a waiver, the agency does reasonably contend that Tenet's failure to appeal the first cost report has made the determination of the hospital's basis all the more problematic. *See, e.g.,* 15 Mertens, Law of Federal Income Taxation § 59:11 (1997) (noting the "difficulty of establishing the value of property a number of years after the valuation date" and that, as a result, a valuation made at such time "will be regarded as lacking in probative value"). Hence, Tenet has no one but itself to blame for its present predicament. We conclude that the PRRB's determination, that the Valuation Counselors report "failed to adequately document the basis of its value for current depreciated reproduction cost," PRRB Op. at 11, is supported by substantial evidence in the record before the agency.[13]

**B**

We next consider Tenet's contention that the PRRB's decision was arbitrary, capricious, and not in accordance with law. Tenet makes two arguments in this regard. First, Tenet argues that Medicare acted arbitrarily in rejecting the Valuation Counselors appraisal for the purpose of determining Tenet's basis in the hospital, while accepting the appraisal for the purpose of computing Humana's gain on the same sale. Second, Tenet argues that the Medicare regulations bar HHS from using net book value as a hospital's basis.

**1**

■ Tenet correctly points out that, although Blue Cross rejected the Valuation Counselors appraisal for the purpose of determining Tenet's basis in the hospital it purchased from Humana, the intermediary accepted that appraisal for the purpose of computing Humana's gain on the sale.[14] Specifically, the intermediary accepted the

13. We reject Tenet's contention that Blue Cross' refusal to rely on the 1983 Valuation Counselors appraisal was inconsistent with a letter in which the intermediary stated that the appraisal "met the Medicare Guidelines [for] an acceptable appraisal." *See* May 7, 1992 Blue Cross Letter at 1 (J.A. at 196). That statement follows directly after a sentence in which Blue Cross wrote that "[t]his appraisal was based on the fair market value (FMV) method," *id.*, and, as we have noted above, Blue Cross did in fact find the apprais-al acceptable for calculating the hospital's fair market value. The sentences that follow, however, make absolutely clear that Blue Cross regarded the appraisal as unacceptable for calculating the facility's depreciated reproduction cost. *Id.*

14. As discussed below, when a provider sells a depreciable asset for a gain, Medicare recaptures its previous depreciation payments from that gain. *See* 42 C.F.R. § 413.134(f)(1).

appraisal's allocation of $4,516,202 of the total sales price to Three Rivers. By accepting the appraisal for this purpose, while rejecting it for calculating Tenet's basis in the hospital, Tenet contends that Medicare acted arbitrarily and capriciously. Indeed, Tenet continues, this treatment gave Medicare a "windfall," because Medicare was able to use the higher valuation to recapture the depreciation expenses it had paid to Humana, while using the lower valuation to pay lower depreciation reimbursements to Tenet. We conclude, however, that there is nothing arbitrary about the conclusion that the appraisal was acceptable for one purpose but inadequate for the other.

First, and foremost, the Medicare regulations expressly require different data for valuing a property for the purpose of calculating the purchaser's basis than for the purpose of calculating the seller's gain. As noted above, the regulations provide that the purchaser's basis in depreciable assets is the lowest of three figures: purchase (sales) price, fair market value, and depreciated reproduction cost. 42 C.F.R. § 413.134(g)(1), (2). As further noted, because the intermediary reasonably concluded that the Valuation Counselors appraisal of depreciated reproduction cost was unsupported, it was also reasonable for it to conclude that the appraisal was unacceptable for the purpose of calculating Tenet's basis.

The regulations governing the seller's gain, however, are different. Gain is determined by subtracting the seller's adjusted basis from the sales price. The seller's adjusted basis is its net book value, which is unaffected by the sale. *See* Provider Manual § 104.10(c), ex. 5; *see also Whitecliff,* 20 F.3d at 489. The sales price is "determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of

each asset." 42 C.F.R. § 413.134(f)(2)(iv). Accordingly, for purposes of calculating the seller's gain, valuation of the property at the time of the sale requires only two figures: total sales price and fair market value, the latter being required to allocate the sales price when more than one asset is sold. As we have noted, the intermediary accepted Valuation Counselors' figures for both the total sales price and the fair market value, and hence of the allocated sales price of the hospital facilities. Because the only figure disputed by the intermediary—depreciated reproduction cost—does not enter into the formula for calculating Humana's gain, it was not arbitrary to accept the appraisal for the purpose of calculating Humana's gain while rejecting it for the purpose of calculating Tenet's basis.

Second, although Tenet is correct that the consequence of using the appraisal for calculating the seller's gain was to permit Medicare to recapture its prior depreciation payments to Humana, there is nothing arbitrary about that result. Rather, it flows directly from the operation of regulations that are not themselves challenged here. Under those regulations, providers are permitted "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care." 42 C.F.R. § 413.134(a). When a provider sells a depreciable asset for a gain, Medicare recaptures its previous depreciation payments from that gain. *See* 42 C.F.R. § 413.134(f)(1). Because annual depreciation allowances are only estimates of the true depreciation of the asset, recapture permits Medicare to recover when actual depreciation—as reflected in the sales price—turns out to be less than anticipated. *See generally Whitecliff,* 20 F.3d at 489. And this means that the amount of money the seller actually receives for the property—the allocated sales price—is the key variable.

By contrast, establishing the purchaser's basis is not intended to permit Medicare to recover for past overpayments generated by using estimates of actual depreciation, but rather to provide the initial value from which future estimates—i.e., the purchaser's depreciation allowances—will be calculated. 42 C.F.R. § 413.130(a)(1), .134. As set forth in a regulation that Tenet has not challenged, 42 C.F.R. § 413.134(g), depreciated reproduction cost is one of the three variables needed to determine the purchaser's basis. There is nothing arbitrary about rejecting an appraisal that did not reliably establish the magnitude of that variable.[15]

### 2

■ Tenet also argues that the Medicare regulations bar HHS from using net book value as a hospital's basis. As the provider correctly points out, paragraphs (1) and (2) of 42 C.F.R. § 413.134(g) do not mention net book value as a permissible basis: They mention only purchase price, fair market value, and depreciated reproduction cost. As HHS correctly notes in response, however, these paragraphs require the intermediary to select the lowest of those three variables as the basis, and are simply silent as to what should be done if the data are insufficient to support one or more of them. The paragraphs do not mention net book value at all, let alone expressly forbid its use.

■ When an agency regulation is silent or ambiguous with respect to the specific point at issue, we must defer to the agency's interpretation as long as it is reasonable. *Indep. Petroleum Ass'n of*

*Am. v. Babbitt*, 92 F.3d 1248, 1256 (D.C.Cir.1996); *see Foothill Presbyterian Hosp. v. Shalala*, 152 F.3d 1132, 1134, 1135 (9th Cir.1998). Indeed, the Supreme Court has advised that "[t]his broad deference is all the more warranted" when the regulation concerns a "complex and highly technical regulatory program" like Medicare, "in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381 (internal quotation omitted). Moreover, as the Court has further explained, HHS does not have a statutory duty to promulgate regulations that "address every conceivable question in the process of determining equitable reimbursement." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Rather, for "particular reimbursement details not addressed by" regulations, HHS properly "relies upon an elaborate adjudicative structure which includes the right to review by the [PRRB]." *Id.* The agency reasonably relied on that structure here.

Lacking an acceptable figure for depreciated reproduction cost, the intermediary concluded that it could not determine which of the three values listed in the regulation was the lowest, and hence could not step-up the basis under § 413.134(g). In such circumstances, Blue Cross recognized, a literal reading of the regulation could require it to assign a basis of zero: "Without the determination of ... current depreciated reproduction costs, the *lesser* ... of these three variables becomes –0– and the Provider's asset basis thus be-

---

15. We also note that while the accuracy of the appraisal of Tenet's basis was important to both Medicare and Tenet, the accuracy of the appraisal of Humana's sales price was not equally significant to either Medicare or Humana. Since the amount of Humana's gain was well above the level that would permit Medicare to completely recapture its depreciation payments, neither Humana nor Medicare had any reason to dispute the precise amount of the gain. *See* HHS Reply Br. at 9 & n.3; A.R. at 460.

comes –0–." Intermediary's Position Paper at 8 (J.A. at 156). Instead of adopting such a Draconian position, however, Blue Cross permitted Tenet to use the basis of the previous owner. "This basis was chosen," the intermediary said, "because it would not exceed the purchase price, fair market value, or depreciated reproduction cost" of the hospital. May 7, 1992 Blue Cross Letter at 2 (J.A. at 197). In addition, the previous owner had maintained "adequate documentation ... on the assets which properly supported their net book value." *Id.* Finally, Blue Cross had been applying net book value as Tenet's basis, without appeal, for each of the previous five years. Under these circumstances, the PRRB determined, and we agree, that "the intermediary's use of the net book value was reasonable." PRRB Op. at 11.

We also note that relegating the provider to the basis of the previous owner is consistent with the agency's longstanding characterization of § 413.134 as a regulation that permits a purchaser to "step-up" the property's basis from that of the prior owner. *See* HHS Br. at 9; *see also* Intermediary Manual § 4508.1 (referring to the calculation as a "'write-up' from the historical cost basis of the acquired depreciable assets"). Although the regulation does not itself use the term "step-up," Tenet also characterizes it as a "stepup" regulation, *see* Tenet Br. at 6, as has this court,

*see Nursing Ctr.*, 990 F.2d at 646; *Richey Manor, Inc. v. Schweiker*, 684 F.2d 130, 133 (D.C.Cir.1982). The logical consequence of such a characterization is that a purchaser who fails to satisfy the regulation's requirements will not be permitted to step-up the basis, and hence will appropriately be left with that of the prior owner.[16]

In a further attack on the intermediary's assignment of the seller's basis to Tenet, Tenet contends that another paragraph of § 413.134(g) expressly bars the use of the seller's basis unless the sale was not bona fide. *See* Tenet Br. at 25–29 (citing para. (5)). Since there has never been any suggestion that Humana's sale to Tenet was anything but bona fide, Tenet concludes that HHS was barred from assigning Three Rivers a basis equivalent to the prior owner's net book value.

■ This argument simply misreads the cited paragraph. Paragraph (5) of § 413.134(g), entitled "Transactions other than bona fide," states that "[i]f the purchaser cannot demonstrate that the sale was bona fide, in addition to the limitations specified in paragraph[s] (g)(1) [and] (2) ... of this section, the purchaser's cost basis may not exceed the seller's cost basis, less accumulated depreciation." This paragraph does provide that if a sale was

**16.** The district court was concerned that limiting the purchaser to the prior owner's net book value "would cause all assets that have exceeded their estimated useful life to have a depreciable basis of $0 assigned to them upon sale," a result the court thought inconsistent with the PRRB's recognition in a prior case that fully depreciated assets may continue to have value. *Tenet HealthSystems*, slip op. at 14 (citing *Unity Hospital*, PRRB Dec. No. 78–D86, Medicare & Medicaid Guide (CCH) ¶ 29,590 (Dec. 21, 1978)). This concern is unwarranted. First, although it is true that the application of straight-line depreciation can reduce an asset's depreciable basis to zero, that would ordinarily occur only at the end of the asset's useful life, which had not been reached here. Second, this result is not arbitrary, but rather the logical consequence of the straight-line method of depreciation, which is embedded in Medicare regulations not themselves challenged by Tenet. *See* 42 C.F.R. § 413.134(b)(3), (g)(2). Finally, the PRRB did not hold that every purchaser should be relegated to the seller's net book value, only that this was an appropriate result in Tenet's case because Tenet had failed to satisfy the regulatory requirements for a stepup. As discussed in the text above, that determination was reasonable.

not bona fide, the purchaser's basis is limited to that of the seller. But paragraph (5) does not say that the *only* time the intermediary may use the seller's basis is when the sale was not bona fide. To the contrary, paragraph (5) says nothing at all about how to calculate the basis when the transaction was bona fide, and instead refers the reader to paragraphs (g)(1) and (2) of the same section. Those are the paragraphs already considered above, which require the use of the lowest of purchase price, fair market value, and depreciated reproduction cost, and which the PRRB reasonably read as permitting use of the seller's basis when the figure offered for depreciated reproduction cost is not reliable. We therefore reject Tenet's contention that the Board's decision is "not in accordance with law."

### III

The PRRB's decision to approve a cost basis for Tenet's hospital that was equal to that of the prior owner is supported by substantial evidence and is not arbitrary, capricious, or contrary to law. Indeed, the use of that basis represented Medicare's reasonable effort to be fair to a purchaser that could not satisfy the regulatory requirements for a steppedup basis. Accordingly, the judgment of the district court is

*Reversed.*